THE CENTRAL RAILROAD AND BANKING COMPANY *v.* KENT.

1. A railroad company which has performed the duty of inspecting and keeping in safe condition its tracks and road-bed with that degree of diligence which the law requires of it, is not liable in damages to one of its engineers for injuries occasioned by running his engine into a washout or chasm caused by a sudden, most violent and unprecedented rainfall, such as the oldest inhabitants of the neighborhood had never before witnessed, the calamity being directly attributable to the act of God, for which no individual or corporation is ever held responsible.

2. After a jury has been stricken to try a cause, it is not error to refuse to allow a restriking because counsel for one of the parties simply states in his place that he had by oversight left on the jury a man who, for reasons alleged, would, in his opinion be partial and prejudiced against his client, it not appearing that even if these things were true, any diligence had been shown to ascertain the same, or that they might not easily have been known by proper and timely enquiry.

3. Upon the trial of an action for personal injuries against a railroad company by one of its engineers, after admitting evidence tending to show that such engineer was experienced and reliable, it was error to charge that, as throwing light on the question whether or not he was to blame, the jury might consider his character as an experienced and reliable engineer, if such character had been shown by the testimony, the evidence mentioned not being relevant upon this particular issue.

4. Whether or not an engineer exercised proper diligence in looking out for defects in the track, is a question for the jury, in determining which they should take into consideration the various other duties which he was required to perform in managing and running his engine.

5. When, in its charge, the court mentions and emphasizes a certain issue, and informs the jury that the pressure of the case is upon that issue, it should be careful not to use in this connection language which may confine the jury, in the determination of this important issue, to a portion only of the facts and circumstances pertinent thereto, but on the contrary, should so frame its instruc-

tions that they may, in arriving at the truth, have in mind and give proper weight to the theories of both sides, and the proof offered in support thereof. Hence, where the court, in charging upon a vital question, as above set forth, calls attention in detail to particular facts favorable to one side, it would be better to call attention in like manner to the facts favorable to the other side, instead of using, as to them, general terms which, however intelligible to a trained legal mind, may not impress, as intended, the minds of jurors, who are non-professional men.

BLECKLEY, C. J., dissenting.

July 20, 1891. Argued at the last term.

Negligence. Railroads. Damages. Practice. Jurors. Evidence. Charge of court. Before Judge MILLER. Bibb superior court. April term, 1890.

Reported in the decision.

R. F. LYON, for plaintiff in error.
DESSAU. & BARTLETT, *contra*.

LUMPKIN, Justice.

1. The testimony in this case was quite voluminous. After a careful examination of it, we find that the following facts indisputably appeared : The culvert under the embankment where the washout occurred, which was near the 126th mile-post from Macon, was constructed in 1858, was properly built, was sufficient in all ordinary storms and freshets to carry off all the water which had to pass through it, had withstood the storms of nearly thirty years, and immediately preceding the great rain-storm which caused the washout was apparently in a perfectly safe condition. That rain-storm was sudden, violent and unprecedented; the oldest inhabitants of the neighborhood had never before witnessed one like it, and the culvert had never been subjected to such a flood as this storm caused. One Jordan, who was then a section-master of the railroad, having charge of the section on which this accident occurred, saw this culvert about 12 o'clock on the day the washout occurred. It was then apparently in

good condition, and he examined it sufficiently to satisfy himself there was no reason to apprehend any danger at this point. At the time he made this examination, the barrel of the culvert was not half full of water, and the rain was falling lightly. Being satisfied that the culvert was in its usual good condition and perfectly safe, he went to another place on the railroad, near the 122d mile post, known as "the slide," where he apprehended there might be danger, as an accident had occurred there before. While Jordan and his hands were at "the slide," which was the place on this section at which there was more likely to be danger than anywhere else, the rain was falling very lightly, and there was nothing to indicate that such a thing as a waterspout had occurred, or would be likely to occur four miles below, where the culvert was situated.

Besides the above facts, concerning which we think there can be no dispute, we desire to allude briefly to some other portions of the testimony. Mr. Kent, the engineer, himself testified that he had never recognized the place where this culvert was located as a dangerous one, and that it was as safe here as any place on the road, according to his knowledge. The train was due at the place where the accident occurred about 3 o'clock in the afternoon, but probably reached there a little after that time. The evidence does not accurately show what time elapsed between the washout and the arrival of the train. This time, as we gather from a consideration of the testimony of all the witnesses whose evidence bore upon this question, was somewhere between thirty minutes and two hours and a half.

This case was before this court at the October term, 1889, and is reported in 84 *Ga.* 351. The last headnote of that decision is in the following language: "The pressure of the case is upon the question whether the company was negligent in not knowing of the wash-

out, so as to have given the plaintiff due notice and warning; and this is a question for the jury, under proper instructions by the court." In the opinion, delivered by Justice Blandford, we find the following words on page 356 : " The question is, was the railroad company negligent in not knowing of the washout, so as to have given the plaintiff due notice and warning? This was a question of fact for the jury. Did the railroad company have time to know the washout had occurred, so that it would be chargeable with notice thereof? If the company knew, or could have known of this washout by the exercise of ordinary and reasonable care and diligence, it would seem from the authorities that it would be liable to the plaintiff for the damage he sustained. But if it did not know of it, and if there was no negligence on the part of the company's servants in not knowing or trying to know, the company would not be liable. It seems to us the pressure of the whole case is upon this point, and in the charge of the court as contained in the record, we do not think that this point was prominently brought to the attention of the jury. This is a matter for the jury to pass upon on another trial of the case." Trying the case by the test thus made, we are of the opinion that the railroad company has conclusively shown it exercised all that ordinary and reasonable care and diligence required of it by law. The question propounded by Justice Blandford, " Did the railroad company have time to know the washout had occurred, so that it would be chargeable with notice thereof?" must be decided in the light of the established facts of the case. In determining whether the defendant, after the washout occurred, had sufficient time before the accident to have discovered the danger, and to have given warning to those in charge of the approaching train, reference must be had to something more than the mere lapse of minutes and

hours between the two events. If a servant of the company had been at or near the culvert exactly at the time the washout occurred, doubtless he could have gone forward and met the train in time to warn the engineer of the danger he was approaching. Indeed, it may be true that after the washout actually occurred, there may have been sufficient time for an employee of the company at " the slide," or anywhere else within the limits of the section, to have gone to the scene of the washout, and then to have given notice to the engineer in time to avert the accident. But it seems to us that there are other questions which ought to be considered and determined in this same connection. What was the character of this culvert? What had been its condition for more than a quarter of a century, and how had it withstood storms and carried off their angry waters during all these years? What was its condition on the very day of this unfortunate accident, but a short time before the accident occurred? What examination had been made of it by the section-master just preceding the washout, and what conclusion had he reached upon the question of its safety? Was his conclusion justified by the attending facts and circumstances? Did the light rain which was falling at " the slide," where the section-master was engaged in the discharge of his duty, give any premonition that a waterspout had occurred, or was likely to occur, at the culvert, four miles below? If the answers to all these questions, and others of like kind which might be suggested, establish the fact that there was no good reason to expect a washout at this point at all, then it was not legally necessary for the company to keep this place under constant watch. We think, in view of all the testimony contained in the record, that no such necessity reasonably appeared to exist. There was far more reason to carefully guard the other place designated as " the slide," and this, it seems, was

being faithfully done. In the light of many years' experience, and in view of the almost numberless tests of strength, durability and security to which this culvert had been subjected, we think the company was justified in concluding on this particular day that it was in safe condition and would remain so. Of course, if the company, by its servants, had actually known of the washout, or the circumstances were such that it ought to have known of it in time to warn the approaching train; or, if the facts showed that the company had any reason to apprehend danger at this point, and failed to provide against the same, then undoubtedly it would have been a case of such negligence on the part of defendant as would entitle the plaintiff to recover. But we do not think this negligence on the part of the company existed, and are of the opinion that the proof shows to the contrary. Railroad companies are under legal duty, both as to passengers and their own employees, to keep their tracks and road-beds in a safe condition, and every engineer has the right to assume that this duty will be observed. The facts in this case, however, show that the defendant complied with its duty in these respects, at least to the extent of exercising all "ordinary and reasonable care and diligence." The simple truth is, this calamity was occasioned by an unusual and unexpected cause, so awful in its nature, and so disastrous in its consequences, that no human being could have foreseen it, or ought, in justice, to be chargeable with negligence for having failed to provide against it. It was the act of God; and the authorities holding that no individual or corporation is, or ever ought to be, held responsible for His acts, are so strong, so numerous and so well recognized, it is unnecessary to cite them. Our conclusion, therefore, is, that even upon the line suggested for a proper solution of this case in the opinion delivered by Justice BLANDFORD, above quoted, the ver-

dict was unwarranted by the evidence, and ought not to stand.

2. The correctness of the proposition announced in the second head-note is sufficiently apparent without discussion.

3–4. It was contended by defendant upon the trial that plaintiff, by exercising proper care in looking out for dangerous places in the track, might have seen the washout in time to stop his engine before running into it, and thus have averted the terrible calamity which occurred. Whether or not this contention of defendant was well founded was one of the questions to be passed upon by the jury, and in determining it, it was of course proper for them to take into consideration, not only the duty which devolved upon the engineer of looking out, but also the various other duties it was necessary for him to perform in managing and running his engine, the state of the weather, and all other pertinent facts shown by the testimony. But in solving the question whether or not the engineer was negligent, the facts that he was experienced, and had previously been reliable, were not pertinent. These facts may have been relevant, and proper to be considered by the jury with reference to other questions involved in the case, but they were not so as to the particular issue with which we are now dealing. Hence, it was error for the court to charge the jury they might consider them, if shown, as throwing light on the question whether or not the engineer was to blame. In the case of the *Atlanta & West Point R. R. Co.* v. *Newton,* 85 *Ga.* 517, substantially the same question was passed upon by this court. That was a suit by a widow for the homicide of her husband, alleged to have been occasioned by the negligence of the railroad. The deceased was not an employee of the company, but nevertheless, one of the defences was that he could have avoided the injury by

the exercise of ordinary care and diligence, and this court held that upon this issue it was not admissible to show his character was that of a prudent and cautious man. The authorities there cited, on page 526, sustain the ruling then made by this court, and are, we think, in point upon this particular branch of the case at bar.

5. The charge of the able and learned judge who tried this case in the court below was clear, comprehensive, and, in the main, a correct exposition of the law applicable, but in certain particulars to which we shall presently refer, it did not present as fully as it might have done the defence of the railroad upon the most vital and important issue in the case. To explain our meaning, we make the following extract from the charge in reference to the question whether or not the railroad company was negligent in not knowing of the washout, so as to give Kent warning: "Now the jury will observe that right here is the main contention of the railroad company, if Kent, the plaintiff, was not at fault on his part; for, if you should find Kent free from blame or negligence in this occurrence, the pressure of the case would be upon this issue: was the railroad company negligent in not knowing of the washout, so as to have given Kent, the plaintiff, due notice and warning? This, gentlemen, is a question of fact for you. It is for you, and you alone, to decide, after a careful study and examination of all the testimony bearing upon that point. At what hour did the rainfall occur that caused the washout? At what point on the road was the train at that hour—how far was the train at that time from the place where the washout occurred—and how long a period of time was consumed by the train in traversing the intervening distance? Find out from the testimony, as nearly as you can, how long that period of time was;—was that period of time sufficiently long for the railroad company, by the exer-

cise of ordinary and reasonable care and diligence, to have discovered the washout and given Kent due notice and warning of its existence? If you find from the evidence that a sufficient length of time intervened between the hour the washout occurred and the time of the accident, so that, by the exercise of ordinary and reasonable care and diligence, the railroad company could have discovered the washout and given notice to the plaintiff, then they would be chargeable with notice of the existence of the washout. But if sufficient time had not elapsed so that, by the exercise of ordinary and reasonable care and diligence, the railroad company could have discovered the washout, then they would not be chargeable with that notice. So you will see, gentlemen of the jury, a great deal depends right there on your finding as to the amount of time that intervened, and whether the amount of time was sufficient for the railroad company, by the exercise of ordinary care and diligence, to have discovered that washout and given warning.''

The objection to this charge is, that it lays great stress upon the amount of time elapsing between the washout and the accident, without calling attention to other facts and circumstances which were of as great importance as the mere length of time intervening between these two events. We have already intimated in the first division of this opinion what some of these facts and circumstances were, and will again refer to them in suggesting what, in our opinion, would have been a proper addition to the charge. The effect of the charge quoted was, we fear, to exclude from the consideration of the jury the real defence of the railroad upon this most important branch of the case. It is true the charge does, in effect, say in more than one place that if the railroad did not have time, "by the exercise of ordinary and reasonable care and diligence,"

to discover the washout and give notice of its existence, it would not be liable; but the use of these general terms last above quoted was not sufficient to properly direct the minds of the jury to the facts they ought to consider in determining whether or not the company did observe due diligence in this respect. It is more than likely the jury understood the court to mean that if the employees of the company had time to go from where they were to the washout after it occurred, discover its existence, and then go back and stop the approaching train, the company was liable; and as he had already instructed the jury that the pressure of the case would be upon this issue, the charge, taken as a whole, was not sufficiently full to do the railroad company justice. It would have been better, we think, if the judge had added to this charge some such language as the following: "In deciding whether or not the railroad company exercised reasonable care and diligence in discovering the washout, you may take into consideration the character of the culvert, the length of time it had stood, its condition on the day of the accident, the examination (if any) made by the section-master, and the character of the rainfall at 'the slide' on the day of the calamity; and in this connection, you may determine whether or not there was sufficient reason for the company's servants to apprehend a washout would occur at this point, or to require the company to keep this culvert under special watch during that day." The charge given, with some such addition as this, would have required the jury, as was proper, to consider the proof offered by both sides upon the controlling issue in the case, and would have enabled them to fairly determine whether or not the company had established the defence it relied upon, viz. that the attendant circumstances were not such as to indicate that a washout was to be apprehended at this point, and consequently,

that due care and diligence did not require of the railroad company any further inspection or watch over the culvert than was actually given.

Rule 9 of the railroad company, which was put in evidence by the plaintiff, is as follows :

"Should a section-master have reason to apprehend washes or injury to the track, bridges or culverts, by rain or storm or flood, he must, whether by day or night, pass over his section fully one hour preceding the passage of any regular train, or repair to the place known to be in the most danger."

Under this rule, the section-master is only required to pass over his section one hour preceding the passage of trains when he has *"reason to apprehend washes or injury to the track, bridges or culverts, by rain or storm or flood."* Holding the company by its own rule, and taking into consideration the real contest in this case as made by the pleadings and the evidence, it becomes apparent that the most important question to be determined was, whether or not *there was reason to apprehend* that this washout would occur. We think, for the reasons above given, this question was not properly submitted to the jury.

A ruling of the Supreme Court of Minnesota, in the case of Gates, administratrix, *v.* Southern Minn. Ry. Co. (28 Minn. 110, s. c. 2 Am. & Eng. R. R. Cases 237), so aptly concurs with and illustrates the views we have above endeavored to express, that we quote, though somewhat lengthy, the charge given by the trial judge, and the remarks concerning it made by the reviewing court. The charge given was as follows: "It is the duty of those who use hazardous agencies and instrumentalities to control them carefully, and to adopt every ordinary known and usually approved invention to lessen the danger, and to guard against every ordinary probable danger by such means as ordinary prudence would suggest or dictate. Railroad companies are bound

to take notice of the topography of the country along their lines of road, and to take notice of the climate in which their roads are, and about the storms and floods that annually occur in those localities, and make all necessary guards against danger caused by ordinary and usually severe storms of the locality where the road is located. It was the duty of defendant to so construct its road as to make it reasonably safe, and to guard against washouts, land-slides, and obstructions which endanger the lives of the passengers and employees passing over the same; and any neglect of the defendant in that behalf would make it liable to the plaintiff, if such neglect caused the injury. It was the duty of the defendant to keep its road in suitable and safe repair, and keep and maintain suitable ditches and culverts, at suitable and proper places to carry off the surplus water running down upon the track or road of the defendant company; and the neglect of the defendant to perform that duty, if such neglect was the cause of the accident, will make the defendant liable."

Referring to this charge, the Supreme Court held that, " notwithstanding the court also in general terms charged the jury that the degree of care and prudence required of the defendant in the case was ' due and ordinary care,' ' reasonable care,' and 'ordinary prudence,' the charge, as a whole, was erroneous, for the jury may have understood from it that it was the absolute duty of the defendant, without regard to the degree of care used by it to effect the purpose, to make all necessary guards against danger caused by ordinary storms, and to guard against land-slides, washouts and obstructions which might endanger the lives of passengers and employees, and to keep its road in suitable and safe repair." In addition to what appears in the head-note just quoted, Gilfillan, C. J., in the opinion observes, in effect, that under this charge, no amount of care and

prudence in guarding against storms and keeping its road in suitable and safe repair would relieve the defendant from liability if the ends aimed at were not accomplished.

The views herein expressed, and supported by the above authority, will make apparent, we think, the correctness of the proposition announced in the 5th headnote.                                    *Judgment reversed.*

BLECKLEY, Chief Justice, dissenting.

On a previous writ of error (see 84 *Ga.* 351), the right of the plaintiff to recover was resolved, and as I think correctly, into a question of fact for decision by the jury. Upon the second trial, the court committed no error of law which affected that question on its substantial merits, and while the verdict may or may not be correct, there was evidence to support it. I believe the presiding judge did not abuse his discretion in denying a new trial. For this reason I dissent from the judgment of reversal.